Charles Joseph Nelson, et al., Plaintiffs-Appellees, Separate Appellants, Cross-Appellants, v. Union Wire Rope Corporation, and Archer Iron Works, a Corporation, Defendants-Appellees, and American Mutual Liability Insurance Company, a Corporation, Defendant-Appellant, Cross-Appellee.

Gen. No. 48,164.

First District, First Division.

January 4, 1963.

Supplemental opinion, January 30, 1963.

Rehearing denied January 30, 1963.

75

80

James A. Dooley, of Chicago, for plaintiffs-appellees, separate appellant, cross-appellants.

Hinshaw, Culbertson, Moelmann & Hoban (John M. Moelmann, Oswell G. Treadway and Thomas J. Weithers, of counsel), for Union Wire Rope Corporation, defendant-appellee; Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (Max E. Wildman and Frederick W. Temple, of counsel), for Archer Iron Works, Inc., defendant-appellee; Winston, Strawn, Smith & Patterson, Berchem, Schwantes & Thuma, of Chicago (Douglas C. Moir, George B. Christensen, Donald N. Berchem and Edward J. Wendrow, of counsel), for American Mutual Liability Insurance Company, defendant-appellant, cross-appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

After thirteen weeks of trial on the claims of eighteen plaintiffs for personal injuries and wrongful deaths, judgments were entered on jury verdicts finding the defendants Union Wire Rope Corporation and Archer Iron Works not guilty, and finding the defendant American Mutual Liability Insurance Company guilty. Damages were assessed in a total amount of $1,569,400.

Four appeals have been filed. Plaintiffs have appealed from the not guilty judgments, and American has appealed from the judgment against it. As to the latter, plaintiffs have filed a cross-appeal.

██ The event which forms the basis of the complaint occurred on March 19, 1957 at the construction site of the Duval County Courthouse in Jacksonville, Florida, and Florida law governs the substantive rights of the parties. (Mithen v. Jeffery, 259 Ill 372, 102 NE 778.) Nineteen workmen (including the eighteen plaintiffs *) were riding on the platform of a hoist which fell from the sixth floor level when a cable broke. Seven were killed and the others were injured. No action was brought on behalf of one of the decedents. Two of the plaintiffs were employees of the general contractor, George D. Auchter Company, which owned and operated the hoist, and the others were employees of Auchter's subcontractors.

The original complaint was filed by two plaintiffs against Archer, manufacturer of the hoist, and Union, manufacturer of the cable. Later on, sixteen plaintiffs sued the same two defendants along with American, the workmen's compensation and public liability carrier for Auchter. American was then added as a defendant in the original complaint and all actions were consolidated.

The complaint against Archer charged that it negligently designed and constructed the hoist and its safety devices; negligenly sold the hoist to Auchter with knowledge that it was imminently dangerous because its safety devices were defective; negligently failed to inspect or test the hoist; and negligently failed to warn plaintiffs that the safety devices were inadequate. The complaint also charged that Archer had warranted that the hoist and its safety devices

---

* The word "plaintiffs" will be considered as including plaintiffs' decedents.

were reasonably fit for the purpose for which they were sold, whereas they were unsafe and defective.

Archer denied all charges of negligence and alleged that the occurrence in question was caused solely by negligence on the part of Auchter. Archer admitted that it had warranted the hoist to be fit for the purpose of hauling a reasonable amount of material, but denied any warranty of fitness for the hauling of personnel. It also denied that it had breached any warranty.

As to Archer, it is plaintiffs' theory on appeal that, under the evidence, this defendant was guilty of both negligence and breach of warranty as a matter of law, and that, therefore, the not guilty judgment should be reversed with judgment here for plaintiffs on the question of liability, and remandment for a new trial on the question of damages only.

The complaint against Union charged that it negligently manufactured the cable; negligently sold the cable, knowing it to be defective or dangerous when used for the purpose intended; negligently failed to inspect and test the cable; and negligently failed to warn plaintiffs that it was defective. The complaint also charged that Union had warranted the cable to be reasonably fit for the purpose for which it was sold, whereas it was unsafe and defective.

By its answer, Union denied all allegations of negligence, denied proximate cause, and, as to the warranty charge, denied privity of contract and denied that it had sold or warranted the cable to be fit for any particular purpose. It also denied that it had breached any warranty or that the cable was defective.

As to Union, it is plaintiffs' theory on appeal that the not guilty judgment should be reversed and the cause remanded for a complete new trial because of erroneous rulings of the trial court on the admission

of evidence, and because of improper conduct on the part of Union's counsel.*

The complaint against American charged that, either gratuitously or pursuant to its compensation and liability policies with Auchter, it had undertaken to inspect Auchter's safety practices and machinery, including hoists, and had represented that it would report to Auchter any unsafe practices or conditions found. It was also alleged that Auchter expected such reports to be made. The complaint further charged that American, having thus assumed the duty to make safety inspections, was negligent in the performance of such duty in regard to the hoist and as a proximate result thereof plaintiffs were killed or injured. Further, and more specifically, American was charged with having negligently failed to detect and report: that the hoist's safety devices were inadequate and defective; that the tower was improperly designed and manufactured in regard to its safety mechanism; that the cable was in a worn condition; that the hoist was being used for the hauling of personnel, in violation of a city ordinance; and that a sheave on the hoist was of improper size, in violation of a city ordinance. It was also charged that American observed but negligently failed to warn Auchter or its personnel, including plaintiffs, against the practice of carrying personnel on an improperly equipped hoist which it knew or ought to have known was hazardous.

American denied each of the negligence allegations; denied that it had assumed the duty alleged; admitted that it had made intermittent inspections for the

* In their brief plaintiffs argued that the evidence had established the liability of Union, as a matter of law, for both negligence and breach of warranty, and prayed for a reversal with judgment in this court as to liability. At oral argument, however, these points were abandoned by plaintiffs' attorney.

purpose of keeping itself advised on the risk which it insured. American pleaded further that it never undertook any control or responsibility for the hoist or its cable or sheave; had nothing to do with their design, manufacture, purchase, installation or maintenance, and assumed no duty in connection therewith. This defendant also pleaded that, because it was Auchter's compensation carrier, it was not subject to suit as a third party tort-feasor under the Florida compensation statute; that, if American were to be considered as having performed safety engineering duties on behalf of Auchter, it would thereby have become a subcontractor, and thus also immune from plaintiffs' suit under the same statute. It also pleaded that plaintiffs had been guilty of contributory negligence and had assumed the risk involved in riding on the hoist.

It is the position of American on appeal that it is entitled to a not guilty judgment as a matter of law, and that, therefore, the judgment against it should be reversed. In the alternative, its theory is that, because of various errors in the course of the trial, the cause should be remanded for a new trial on the issue of liability only.

With respect to their cross-appeal against American, it is plaintiffs' contention that the damages awarded were inadequate, and that, because of trial errors, the judgment against American should be reversed and the cause remanded for a new trial on the issue of damages only.

The facts in their general outline are not in dispute.

Late in 1955 Auchter decided to buy an Archer construction hoist for use at its Duval County Courthouse project. It purchased such a hoist from Moody & Sons, a manufacturers' representative in Jacksonville. The parts for the hoist were manufactured by Archer and shipped direct to Auchter, together with blue-

prints for its erection. Archer did not supply the motor or the cable.

The hoist consisted of a double-welled tower, 130 feet high, constructed of three-inch standard tubular steel in which two skeletal cages, or bails, could be raised and lowered. The bails were so designed that either a platform 6½ feet square or a large concrete bucket could be attached. The occurrence in question took place in the south tower where a platform was in operation, while a concrete bucket was employed in the north tower.

The bail, with the platform attached, was raised and lowered by steel cable and moved along vertical guide rails on each side. The hoist was equipped with a "broken rope safety," consisting of two serrated jaws, or "dogs," attached to the bail. The jaws were designed to be forcibly extended outward to engage the two guide rails whenever pressure was released on the cable, thus arresting the gravitational fall of the platform by the metal friction produced between the dogs and the rails.

The south hoist was erected in May, 1956 and was continuously in use until the time of the accident ten months later. The cable employed in the tower was a ¾ inch steel wire rope manufactured by Union in March, 1956 and purchased by Auchter from a dealer in Jacksonville. The hoist was put up and rigged, and later rerigged, by employees of Auchter under the supervision of a mechanic and yard master who was not an engineer and had not had previous experience in rigging a construction hoist.

As originally erected, in accordance with Archer's design, the tower was rigged with a "one-part line." The cable was affixed to the top of the bail, ran to the top of the tower and over two grooved pulley-type wheels, or sheaves (making a 90° bend in passing over each of the two sheaves) and then down to an-

other sheave at the bottom of the tower and around a drum which was activated by a motor. These three sheaves were supplied with the tower by Archer, and each had an inner diameter of 16 inches.

Upon erection of the tower, and before it was put in use, the safety devices were tested by Auchter, and found to be operating. Shortly thereafter, Hodge, Auchter's superintendent, decided to slow down the speed of the platform and, to accomplish that result, rerigged the cable with a "two-part line." Another sheave, approximately 10 inches in diameter, was affixed to the top of the bail. This sheave was not new, but used, and was procured from Auchter's yard. The end of the cable which previously had been attached to the top of the bail, was now attached to the top of the tower from where it ran down to the bail, around the 10-inch sheave, back up to the original sheaves at the top of the tower, and then down to the drum, as before. The cable was, thus, bent through 180° in passing around the 10-inch sheave on the top of the bail. A new cable was installed and the safety devices were again tested by Auchter two or three times that day.

Oral and written recommendations were made to Hodge and to Auchter, respectively, by the Florida Industrial Commission * that workers should not be permitted to ride the hoist except when oiling or repairing guides. Hodge issued directions at the outset that no personnel were to ride the hoist, and these orders were never changed, although there was no evidence that plaintiffs had ever personally been instructed not to ride the hoist. When first put in operation, the hoist was used exclusively for the lifting of materials and equipment. As the structure increased in height to the third or fourth floor, however, there was so much complaint from the workmen

---

* After inspection of the project on November 26, 1956.

88

about climbing the stairs that Hodge decided to "go along" with the common practice in the city of permitting the men to ride the hoist. Thereafter, he knew that they were riding the hoist daily, and he rode it himself. Others of Auchter's supervisory personnel also used the hoist repeatedly.

The operator of the hoist testified that, on instructions from Hodge, he tried to limit to six the number of men riding the hoist, but that he did not succeed, particularly when the platform was being lowered, as he then had no control of the number getting on. There was also evidence that the stairways were ill-lit; that, on occasion, they were littered with waste material; and that sometimes they were closed.

On the day of the accident, at quitting time in the afternoon, nineteen workmen got on the hoist platform at the fifth floor level. The operator, on the ground, saw that they were getting on, and kept his foot on the brake holding the cable at the drum. He watched for a signal to lower the platform, but there was no signal. Without his releasing the brake, the cable eased down three or four inches, and then broke. The safety dogs engaged the guide rails, but failed to hold, and the platform fell to the ground, resulting in the death or injury of all the men aboard.

Fault on the part of Auchter is not an ultimate issue in this case.* It is the contention of Archer, however, that the record clearly establishes that Auchter failer to assemble the hoist as directed by Archer's blueprints; that Auchter failed to make proper inspections of the hoist and its cable; that it used, or permitted its employees to use, the hoist for the carrying of passengers, in violation of law; that, in so doing, it grossly overtaxed the safety devices which were not designed for the safety of personnel

---

* It may be said to relate secondarily to the charges against American.

or for the weight carried at the time of the accident; and that all of these negligent acts, or failures to act, on the part of Auchter were the cause of the accident to the exclusion of any fault on the part of Archer.

■ The record does show conclusively that, in the erection of the hoist, Auchter deviated from Archer's plans and recommendations in three major respects.

At the base of the hoist the concrete posts, into which the guide rails were set, were 1³⁄₁₆ inches farther apart than directed in the blueprints. In view of the type of safety devices employed, it is apparent that such a widening of the space between the guide rails would diminish the force with which the dogs would grip the rails, thus reducing the cutting and friction which were relied on to arrest the fall of the platform toward the bottom of the tower. This proposition is also abundantly supported by expert testimony.

A 60 horsepower motor was used instead of the 50 horsepower recommended by Archer. It is not clear that this caused the platform to move faster than it would otherwise have done, but it does present a question of fact in that regard.

In any event, the hoist did operate at a speed greater than was desired by Auchter, and this prompted the changing of the rigging. As has been mentioned, the "two-part line" rigging involved the use of a 10-inch sheave (furnished by Auchter) at the top of the bail, whereas the other sheaves (furnished by Archer) were 16-inch. The witnesses agreed that the size of a sheave, over which a ¾ inch steel cable passes, has a very important bearing upon the rate at which the cable will wear out. In comparing 16-inch and 10-inch sheaves, plaintiffs' own expert testified, for example, that the cable would wear out 2½ times faster when used with the smaller sheave. Other witnesses testified to higher ratios, up to four or five

times as fast.* Furthermore, the second rigging required a bending of 180° around the smaller sheave, whereas the plans called for two separated 90° bends around the larger sheaves.

The record also makes it plain that the fit of a cable into the groove of a sheave is an important factor in cable wear. The 10-inch sheave supplied from Auchter's yard had been used before, was in worn, rough and corrugated condition, and the contour of its groove did not fit the contour of the cable.

Inspection of the hoist and particularly of the cable, was made by a general construction foreman for Auchter. He had worked on construction jobs for 22 years; was concrete foreman on this job, and also was general supervisor of other labor foremen. He had never had any instruction or special training in the maintenance of hoists and had been given no material on the subject, his knowledge having come solely from experience.

The inspections were made every ten days or two weeks, on which occasions the foreman was raised on the platform to the top of the tower and then lowered slowly. This enabled him to make a visual inspection of the cable as it passed over the sheave at the top of the bail. The cable was kept greased by periodic application of a heavy, dark-colored lubricant and it was the cable thus lubricated which was inspected, since the foreman did not remove the grease for the purpose of looking at the metal of the cable itself. He looked for broken wires or spurs but never saw any. He did not use any instrument to inspect the inner part of the cable, nor did he run his hand over the cable to check for spurs. The inspector would

* There is testimony that Hodge, based on 35 years' experience, had no hesitancy in using a 10-inch sheave with a ¾-inch cable; that his company made 40 to 50 installations a year in this way. This evidence, however, does not tend to dispute the testimony about comparative cable wear.

91

not devote the entire trip on the hoist to inspection of the cable, as he also would take a general look at the whole working apparatus of the tower, including the guide rails. Each inspection involved only one trip on the hoist.

Expert witnesses testified that inspections at ten-day intervals are not sufficiently frequent; that parts of the cable should be cleaned of grease to insure adequate inspection of its exterior metal where broken wires would then be visible to the naked eye; that broken wires are evidence of wear, although there is some tolerance in this regard; that a magnifying glass should also be used in the inspection of a cable, with a hammer to check cracks; that a marlin spike should be used to separate strands of the cable to locate interior breaks; and that a gauge should be used to check the grooves of the sheaves.

The ¾ inch steel cable in question was part of a 10,000 foot reel which had been shipped by Union to its dealer in Jacksonville. It consisted of six strands of 25 wires each, or a total of 150 wires. The cable had a catalogue rated strength of 46,000 pounds, and doubling the cable (by "two-part line" rigging) roughly doubled its load capacity.

Expert witnesses examined and tested the broken cable after the accident. There was testimony on behalf of plaintiffs that the cable's wires were brittle, and, thus, excessively susceptible to fracture; that this was a defective condition indicating improper manufacture. Plaintiffs' witnesses discounted the possibility that the breaks were the result of metal fatigue, although one of them calculated that the break in the cable occurred at a spot which passed over all three sheaves.

On the other hand, expert witnesses testified on behalf of Union that there were hundreds of fractured wires in the twenty feet of cable near the point of

92

separation and that they were fatigue fractures; that breaks in external wires tend to curl or "spur" and a hoisting cable having 10% of the wires broken (in a running foot) should be discarded; that these breaks in the wires were evident through the grease which covered the cable; * that laboratory tests of the wires which had broken indicated the chemical content of the steel to be within normal limits; that there was no evidence of brittleness; that sections of the cable involved in the accident were subjected to tensile tests and the lowest point at which the strands began to fracture was 47,850 pounds.

Plaintiffs base their negligence charge against Archer on the line of cases stemming from MacPherson v. Buick Motor Co., 217 NY 382, 111 NE 1050 and including Tampa Drug Co. v. Wait, 103 So2d 603 (Florida 1958). The principle declared in those cases, eliminating the requirement of privity and establishing the correlative duty to manufacture with due care in regard to foreseeable use of the commodity, is not contested here. Its applicability is, however, very much in dispute.

A substantial part of plaintiffs' brief is devoted to argument that Archer was negligent in not adopting a plan which would produce a safe hoist, in not selecting proper materials and parts, and in not making proper tests during manufacture and after comple-

---

* Hodge and the foreman who periodically inspected the cable testified that they never saw any spurs or other cable defects. The last inspection of the cable had been on the Friday before the Tuesday of the accident, and the hoist was not used on Saturday or Sunday.

Only one witness testified that he had seen spurs on the cable. He said he saw "up to 5" spurs on 3 feet of cable about 18 feet above ground in November, 1956. He made no mention of it, however, until the time of his deposition in 1958.

Eleven other witnesses who had ridden the hoist, gave general testimony that they had seen nothing wrong about it.

tion of the hoist (relying upon Comment C to Section 398 of the Restatement of the Law of Torts). Many references are made to the record to show that the safety devices, as designed, would not hold a loaded concrete bucket and that such a loaded bucket would weigh more than the platform with nineteen men aboard; that Archer had bought standard steel piping for its towers and did not develop extraordinary specifications calculated to meet the special requirements of the guide rails; that the tower had not been tested by Archer since the tests which were made at the time of its design in 1928 when the tower was put into production; that the final product in this case was never assembled and tested by Archer * for operation of the safety devices; and so on.

 Archer's brief seeks to answer these contentions by further record references and arguments. We believe, however, that it is unnecessary to consider these points raised by plaintiffs because they necessarily fall with our determination of a proposition which is basic to all of them, and that is the principle that the standard of care required of a manufacturer must be related, through reasonable foreseeability, to use of the product for the purpose for which it is manufactured.

This subject is well covered by the very sections of the Restatement on which plaintiffs so strongly rely. They are:

> Sec. 395—A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those *who lawfully use*

---

* As mentioned earlier, the safety devices were tested by Auchter upon erection of the tower, and again after its re-rigging.

*it for the purpose for which it was manufactured* and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by *its lawful use in a manner and for a purpose for which it was manufactured.*

Sec. 398—A manufacturer of a chattel made under a plan or design which makes it dangerous *for the uses for which it is manufactured,* is subject to liability to others whom he should expect *to use the chattel lawfully* or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design. (Emphasis supplied.)

■■ In this regard the jury was properly instructed that Archer was required "to use due care and caution in the manufacture and testing of its product *for its intended use.*" The jury having found Archer not guilty, the question,* as to this point, then becomes whether or not there was any evidence which, taken with its intendments most favorable to Archer, tends to support the verdict. (Pennington v. McLean, 16 Ill2d 577, 582, 158 NE2d 624.)

■■ We believe that the record amply supports Archer's position that the tower was manufactured for use solely as a material hoist and for no other purpose; and that Archer, therefore, was not required to equip such a hoist with the safety mechanisms of a passenger elevator.** Nor was Archer required to

---

* In view of the fact that plaintiffs' appeal seeks reversal by this court with judgment here for plaintiffs on the question of liability.

** The safety mechanisms required by law for passenger elevators differ greatly in character and extent from those used on construction material hoists. Plaintiffs contend that some of these devices should have been employed on the hoist in question, but, inconsistently, they do not urge that Archer should have met all the requirements for a passenger elevator.

foresee that the hoist would be used to transport personnel, in apparent violation of a Jacksonville ordinance prohibiting the use of a "platform elevator" for passenger service.*

The bills of sale from Archer to Moody and from Moody to Auchter show that the hoist was sold and bought as a "3 wheel-barrow tower." This description was also used in Archer's advertising. Witnesses explained that this description indicated a tower with a capacity designed for the lifting of a platform carrying three wheelbarrows loaded with concrete. Further there was evidence that the total weight of the bail, platform and three full wheelbarrows was about 2300 pounds; that the safety devices were adequate for that weight; that the tower itself would safely support the weight of a full concrete bucket (approximately 7000 pounds), but that the safety devices would not hold such a bucket when loaded and were never intended to do so.

An expert witness who examined the equipment after the accident testified that marks on the guide rails indicated that the dogs had engaged the rails continuously except for short distances; that there was no malfunction of the safety devices; that they performed perfectly within the limits of their capacity and were not in any way defective; that they were not designed to hold a platform carrying nineteen men; that, by the pressure of the cutting edges of the dogs against the rails and the friction developed between them, the dogs had destroyed themselves in the manner intended; that the condition of the dogs and the

---

* This ordinance was introduced in evidence by plaintiffs, but it is also relied on by Archer. Plaintiffs and Archer thus, in effect, stipulate to the applicability of the ordinance to the dispute between them.

In their claim against American, plaintiffs rely on the ordinance in contending that the use of the hoist was unlawful. American, however, disputes the applicability of the ordinance.

rails indicated that there could not have been a free fall of the platform.

There was some contrary expert testimony introduced on behalf of plaintiffs, but in our consideration of this phase of the case we are concerned only with evidence tending to sustain the verdict.

██ We conclude, then, that there was evidence on the basis of which the jury could properly have determined that Archer was not negligent in the manufacture of the hoist for the purpose for which it was intended lawfully to be used.

██ What we have said, in this regard, concerning negligence applies also to plaintiffs' contention that Archer was liable for breach of implied warranty. As stated in plaintiffs' brief, their point is that "when the seller knows the use for which an article is purchased, an implied warranty of its fitness for such purpose arises as a matter of law."

Archer argues two points in this regard. First, it says that the case of Continental Copper & Steel Industry v. Cornelius, 104 So2d 40 (Fla App, 1958), relied on by plaintiffs to impose an implied warranty without privity, does not extend the rule beyond a purchaser; that since plaintiffs were not purchasers anywhere in the chain there was no contractual relationship to which a warranty could attach. Second, Archer argues, the basic factual requirement for warranty is absent, being the situation in which a buyer's desire for a product to meet a particular need, or for a particular purpose, is made known to the seller and in making the purchase the buyer relies on the skill, judgment or experience of the seller.

Plaintiffs' response to both these points is that an implied warranty carries with it an absolute liability which runs with the chattel, eliminating the necessity of any kind of privity, citing Matthews v. Lawnlite Co., 88 So2d 299 (Florida, 1956), and Carter v. Hector Supply Co., 128 So2d 390 (Florida, 1961).

97

Because of the view we take of the scope of such a warranty, if there were one, we consider it unnecessary to determine these points or comment on the cases cited pro and con in the briefs. It may be, as contended by Archer, that the principle of warranty is not applicable at all to the facts of this type of case, but, if it were applicable, such a warranty would also be limited in scope to fitness of the article for the purpose intended.

Here, again, we believe that there was evidence on the basis of which the jury could properly have determined that there was no breach of implied warranty, since the use of the hoist at the time of the accident was outside the scope of the purpose for which it was intended.

Plaintiffs' next argument concerns alleged improper conduct on the part of Archer's attorney. In considering this point, and others relating to alleged errors of the trial court, it should be borne in mind that this was a thirteen-week trial. It seems unlikely that there ever have been thirteen weeks of hotly contested jury trial in which there were not some errors committed by the trial judge and some conduct on the part of ardent advocates which was not entirely proper. In so stating, we do not believe that we encourage the lowering of professional standards, but merely place in their proper perspective the mistakes which both court and counsel will ever seek to avoid, but probably never with complete success.

It is against this background, then, that we shall consider the question, properly put by plaintiffs, as to whether or not conduct of counsel, or trial court errors deprived plaintiffs of a fair trial. We believe that they did not.

On the strength of Chicago City Ry. Co. v. Gregory, 221 Ill 591, 77 NE 1112; Emich v. Citizens Trust & Sav. Bank, 321 Ill 518, 152 NE 580; and Paliokaitis

v. Checker Taxi Co., 324 Ill App 21, 57 NE2d 216, plaintiffs contend that persistent efforts were made by Archer's attorney to introduce inadmissible testimony and documents, and that, particularly as to the latter, plaintiffs were prejudiced before the jury in being called upon to interpose repeated objections. As to the latter, they also cite Moore v. Daydif, 7 Ill App2d 534, 130 NE2d 119 and Smith v. Johnson, 2 Ill App2d 315, 120 NE2d 58.

In each of the several instances urged upon us, the trial court sustained plaintiffs' objections, and we believe that to reverse this case under these circumstances would be to give the point a weight all out of proportion to its importance in the record.* Furthermore, most of the evidence complained of was subsequently admitted after further foundation testimony, and some may have been properly admissible without it.

Similarly, in plaintiffs' complaints about Archer's counsel's examination of its own expert witness, his examination or cross-examination of Union's expert, or his reading from the Hodge deposition, we find nothing which would justify the granting of a new trial.

THE JUDGMENT OF NOT GUILTY AS TO ARCHER IRON WORKS IS AFFIRMED.

As to Union, plaintiffs introduced evidence by which they sought to prove that the cable had broken because it was defective, and that it was defective because of negligence in testing and at various stages in the course of its manufacture. To counter this evidence, Union endeavored to show by its witnesses that its product was free from defect, and its manufacturing process free from negligence. Union,

---

* The record, consisting of some 7500 pages, contains the testimony of more than 100 witnesses and more than 600 exhibits. There are 800 pages of briefs.

like Archer, also sought to blame the accident on the negligence of Auchter.*

We mention the general outline of the factual dispute with Union only as a back-drop for consideration of the alleged reversible errors of the trial court in the rejection and admission of evidence.

First, it is argued that the court should have permitted plaintiffs to introduce evidence of the condition of the cable on the north tower. This was the adjoining tower in which Auchter operated a cement bucket. Both towers were erected at the same time, were rigged in the same fashion, used the same size cable and sheaves, and were operated at the project over the same period of months. Plaintiffs contend that this proof, with additional testimony showing that the north tower cable did not break, would have been proper evidence tending to show that the south tower cable, which did break, was defective.

We believe that the trial court properly rejected such proof. The cable in the north tower was made by a different manufacturer and there is no evidence of its type, quality or process of manufacture, so it could not be compared with Union's cable except as to size. More importantly, however, there is no evidence that the cables had received the same wear, and no such evidence was available. Auchter kept no records of the number of trips of the two hoists, or of the weights carried. Both hoists were made available to the subcontractors, and they kept no records of their use. As the work progressed, access from the various floors to the north tower was bricked in, and there never was any access to the north tower from the fifth and sixth floors. Auchter's superintendent testified that

---

* We realize, as urged by plaintiffs, that negligence on the part of Auchter would not bar a finding against either Archer or Union, or both, if they were also guilty of negligence which was a proximate cause of plaintiffs' injuries.

the south tower was used "a lot more" than the north one. Although it is true that each tower was rigged with one small, used sheave, there is no evidence as to the condition of such sheave in the north tower, while there is important testimony concerning the rough or grooved condition of the sheave in the south tower and the relationship of this condition to the rate of cable wear. Also, there was evidence that the south tower cable was inadequately inspected and maintained, while there is nothing in plaintiffs' offer of proof describing maintenance of the north cable.

■■■ The offer was properly refused, as the tendered proof would only have confused the jury with improper collateral issues. (Lathrop-Paulson Co. v. Perksen, 229 Ill App 400, 404; Erie City Iron Works v. Dempsey, 77 Ill App 667, 669; Hartford Deposit Co. v. Sollitt, 172 Ill 222, 226, 50 NE 178; Jewell Filter Co., O. H. v. Kirk, 200 Ill 382, 385, 65 NE 698.) Plaintiffs have cited, as bearing on this point, the cases of Moore v. Bloomington, D. & C. R. Co., 295 Ill 63, 67, 128 NE 721; Nixon v. City of Chicago, 212 Ill App 365, 379; Cooper v. Randall, 59 Ill 317, 320; Paisley v. American Zinc Co., 235 Ill App 22, 34; Belvidere Gaslight & Fuel Co. v. Jackson, 81 Ill App 424, 429; and City of Litchfield v. Whitenack, 78 Ill App 364, 367, none of which, in our opinion, calls for a conclusion contrary to that reached by the trial court in this case.

■■■ Plaintiffs' next contention is that the court erred by admitting into evidence an exhibit consisting of some unused pieces of wire, identified as having been cut, after the occurrence in question, from the same reel of wire rope, then in storage, as that from which had come the cable used in rigging the south tower—the cable which had broken at the time of the accident.* It is argued that the court's error lay in

---

* This exhibit did not go to the jury room, but was used solely as the basis for expert testimony.

the fact that the circumstances and uses of this exhibit were not substantially similar to the circumstances and uses of the cable on the south tower. No authorities are cited.

This contention appears to comprehend neither the purpose of the exhibit nor the reason why, in our opinion, it was properly admitted. Since Union was charged with negligent manufacture and sale of a defective cable, this exhibit bore importantly on these issues, tending to show the unused condition of the cable as it was when sold by Union, and, thus, going to the essence of the allegations against Union. To have kept it from the jury would have been highly prejudicial to Union, and ordinary fairness required its introduction into evidence. Its admissibility is also supported by Luetgert v. Volker, 153 Ill 385, 388, 39 NE 113, and Ames v. Quimby, 106 US 342.

 This exhibit of unused wire was put through various photomicrographic and other tests by a metallurgist qualified as an expert in the field of wire (not cable) who testified on behalf of Union. Among these tests were some in which he produced fractures of the wire by a fatigue machine and, after photographing the breaks, made analyses of the chemical content of the wire. He also tested some wires from the section of the cable which broke in the accident. The chemical analysis of both sets of wires was found to be within the range of normal for its type, and the witness concluded that there was no evidence of brittleness in any of the pieces of wire tested.

Here, again, plaintiffs' objection is based on dissimilarity of conditions, and reliance is made on cases concerning experiments. We do not consider this to be experiment evidence, but rather the properly admissible testimony of a qualified witness in which he related his findings (based on his knowledge and experience applied to tests and examinations made by him)

as to the ductility and chemical components of wires from a single reel of cable; the wires being in substantially the same condition they had been in at the two most critical times in this case—the day of the cable purchase by Auchter, and the day of the accident.

■ Another of Union's exhibits admitted into evidence was a display board on which were mounted thirteen pieces of wire adequately identified by Union's production manager as representing the thirteen steps from raw steel to finished product in the manufacture of the type of wire used in the cable in question in March, 1956. We believe plaintiffs' objection to this exhibit is unfounded. The exhibit did not go to the jury room, but was admitted for the limited purpose of assisting the jury in its understanding of the wire reduction process. Furthermore, the limited purpose of the exhibit was fully explained to the jury by the court. (Smith v. Ohio Oil Co., 10 Ill App2d 67, 75, 134 NE2d 526; Pennsylvania Coal Co. v. Kelly, 156 Ill 9, 18, 40 NE 938; American Express Co. v. Spellman, 90 Ill 455, 456.)

■ Witnesses on behalf of Union testified to the equipment and manufacturing processes which they observed at Union's plant in 1959. Some 34 photographs depicting these operations in 1959 were also introduced in evidence. Union's vice-president in charge of production then testified further that the manufacturing and testing operations shown in the photographs were the same as they had been in 1956 at the time the wire in question was made.

With the photographs as a foundation, engineers and other witnesses, qualified in the wire rope industry, testified that the operations portrayed were usual and customary throughout the industry in 1956.

Plaintiffs, in effect, concede that the photographs were introduced (essentially without objection) for

103

the proper purpose of showing the processes employed in 1956, but complain that they were employed for the improper purpose of showing that these processes had remained unchanged in 1959. By analogy it is argued that, since plaintiffs would not have been permitted to show changes in the manufacturing operations after the accident (because the jury might unfairly interpret the changes as an admission of negligence), then Union should not have been permitted to show that there had been no changes (because the jury might unfairly conclude that no changes were required and that Union had, therefore, not been negligent in 1956). Cases cited in support of the first half of this proposition include Grubb v. Illinois Terminal Co., 366 Ill 330, 8 NE2d 934; Lee v. Toledo, St. Louis & Western R. Co., 190 Ill App 383; and Day v. Barber-Colman Co., 10 Ill App2d 494, 135 NE2d 231. No cases are cited in support of the reverse part of the proposition.

The soundness of the cases cited is not in dispute, but the analogy contended for is without merit. It overlooks, in our opinion, the reason behind the established rule, the reverse of which would not necessarily follow.

 Furthermore, this whole segment of the evidence was clearly appropriate, and available to Union in contesting the charge against it that its 1956 operations were negligent. Being competent for this purpose, the evidence does not become incompetent just because the jury might draw improper inferences from it in some other light. (Eizerman v. Behn, 9 Ill App2d 263, 132 NE2d 788; Fenwick v. Blue Bird Coal Co., 12 Ill App2d 464, 140 NE2d 129; Mandell v. Miller, 14 Ill App2d 430, 144 NE2d 791.)

 Seven exhibits were introduced in evidence by Union which are objected to by plaintiffs as being hearsay. These are records of Sheffield

104

Steel Company relating to the heats of steel from one or more of which the wire for the cable in question was manufactured by Union, and the records were used as a basis for testimony as to the chemical content and grain structure of the steel.

The chief chemist of Sheffield testified that the exhibits recorded the chemical analysis of each heat of steel; that these analyses were made of every heat of steel by 24 chemists under his direction and were recorded from tests of the various heats made while the steel was molten; that the handwriting of the records was not that of the witness, but of competent chemists who made the tests under direction of the witness; that the accuracy of the chemists' work was checked by the witness in the laboratory periodically; that the records were kept in the regular course of business under the witness' supervision; that he examined and "checked over" each of the heats of steel concerned; that the records had been under his jurisdiction and kept in his department since the time they were made.

Plaintiffs first argue that these records do not qualify as books of account within the meaning of Section 3 of the Evidence Act (Ill Rev Stats c 51, § 3). That section permits a party or interested person who sues or defends on such records to testify to their contents, and introduce them in evidence on certain conditions, despite the provisions of Section 2 of that Act which would otherwise make such person incompetent. This statute is not a codification of the rule for admission of business records generally, but applies only to the very special circumstance indicated. That it affords no authority for the admissibility of the records in question is patent, but they were not offered or admitted under that statute. They are the records of a third person, and are admissible under the long-recognized common law rule relating to records kept

in the regular course of business—an exception to the hearsay rule, recognized as such because this type of evidence arises from a circumstance offering every inducement to the accurate recording of information and none to its falsification. (People v. Small, 319 Ill 437, 476, 150 NE 435; Kenna v. Calumet, Hammond & Southeastern R. Co., 206 Ill App 17, 38, 39 (First District); Gauger v. Mills, 340 Ill App 1, 9, 90 NE2d 790 (Second District); W. T. Rawleigh Co. v. Ulm, 268 Ill App 248, 258 (Third District); In re Estate of Moorhouse, 249 Ill App 432, 445 (First District); Wigmore on Evidence, Third Edition, Sec 1530(3).)

Plaintiffs rely on Wright v. Upson, 303 Ill 120, 135 NE 209. In that case, however, there was no supervising employee who testified to the type of foundation evidence which was introduced in the case at bar. The hospital record there was testified to by only one of a number of nurses who had made entries therein. A parallel to the facts of the Wright case would have existed here if only one of the recording chemists had testified, without the full and complete foundation which was laid by the testimony of the chief chemist.

 Arguing from dictum in the Wright decision, plaintiffs urge that the records are, nevertheless, inadmissible unless all persons who made the entries have testified to their correctness; and that the only circumstance under which such testimony may be executed is upon a showing that the persons who made the records are deceased or out of the jurisdiction.

 We consider this argument to be faulty. It confuses the hearsay exception for business entries with that for recorded recollection, and fails to recognize that "the dependability of regular entries rests upon proof of a routine of making accurate records, rather than upon the testimony of each participant that he himself was accurate." (Cleary, Handbook of Illinois Evidence, § 13.35.)

■ Rule 5 of the Municipal Court of Chicago * incorporates the principle which we believe should control the admissibility of business records in all our courts, in the absence of statute or contrary rule.** It provides as follows:

> Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of such act, transaction, occurrence or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter.
>
> All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

■ ■ Finally, as to alleged evidence errors, plaintiffs contend that certain hypothetical questions put to one of Union's expert witnesses improperly invaded the province of the jury. We conclude that the questions were proper (Brown v. Sterling Abrasives Division, 5 Ill App2d 1, 7, 124 NE2d 607), but shall not comment on them in detail because plaintiffs made no objections at the trial and are, therefore, not in a position to claim error on that point in this court.*** It is true that counsel for American interposed objections

---

* This rule is fashioned after Section 1732(a) of Title 28 of the United States Code.

** The Circuit and Superior Courts have adopted no rule on this subject, and it is not covered by any statutory provision.

*** In their brief on the appeal of American, plaintiffs rely on the testimony objected to in their appeal against Union.

in the trial court, but plaintiffs did not join in the objections and the record thus preserved by American does not inure to the benefit of plaintiffs. (Allegretti v. Murphy-Miles Oil Co., 280 Ill App 378, 390; Central Standard Life Ins. Co. v. Gardner, 36 Ill App2d 292, 183 NE2d 881, 885.)

On cross-examination of the wife of plaintiff Nelson, counsel for Union asked her if she had any children, and she answered "No." The attorney for plaintiffs then objected, and his objection was sustained. Plaintiffs do not, of course, complain of the trial court's ruling on this point,* but assign as reversible error the conduct of Union's attorney in asking a question which they contend was so clearly improper and prejudicial.

The decisions in Jones & Adams Co. v. George, 227 Ill 64, 70, 81 NE 4 and McCarthy v. Spring Valley Coal Co., 232 Ill 473, 479, 83 NE 957, reversed lower court personal injury judgments because those plaintiffs had introduced on their own behalf evidence showing them to have been family men with wives and children. It was held that, since the only damages recoverable were those compensatory to plaintiffs, the evidence concerning the children, which had been admitted over objection, was an improper appeal to the sympathy of the jury. Similarly, in Falcon v. LaRoche, 4 Ill App2d 112, 123 NE2d 587, it was held error for defendant's attorney to have asked defendant if he were married and had children, as that, too, was calculated to induce undue sympathy on his own behalf.

None of these cases holds that it would be improper for a defendant to show that a plaintiff had no chil-

---

* The court was not requested to strike the answer already given, or to instruct the jury to disregard it.

dren, and we know of no decision on the subject. Indeed, such evidence might reasonably be admitted to negative the existence of children as to which the jury could otherwise speculate and, then, through such speculation coupled with sympathy, improperly award excessive damages. We do not pass on this point, however, because plaintiffs' analogy, based on the cases cited, does not make it so clear that the question asked in the case at bar was improper, as to render the mere asking of it the kind of unprofessional conduct which would require reversal of this judgment.

Furthermore, the impropriety, if any, of the question complained of could properly bear only on the issue of damages, and the jury found Union not guilty. It is inconceivable that the jury's knowledge (however improperly we might assume it to have been acquired) that Nelson, one of the eighteen plaintiffs, had no children could have been the effective cause of a change in verdict from guilty to not guilty as to Union. Plaintiff Nelson was awarded a verdict of $300,000 against American.

█ Lastly, as to the conduct of Union's attorney, plaintiffs urge the impropriety of his persistence in the offering of evidence previously ruled inadmissible, and a statement made by him in closing argument to the effect that plaintiffs' request for damages was "more money than the whole bunch of us combined will probably ever see." Plaintiffs' attorney made no objection to either of these matters at the time they arose in the trial court, but contends that they are, nevertheless, subject to review on the authority of City of Chicago v. Pridmore, 12 Ill2d 447, 453, 147 NE2d 54, and City of Quincy v. V. E. Best Plumbing & Heating Supply Co., 17 Ill2d 570, 577, 162 NE2d 373.

■ Without determining whether there was any impropriety or error involved in either matter,* we do conclude that it was not of such magnitude as to deprive the parties of a fair trial or result in the deterioration of the judicial process—the standards established in the Pridmore case for consideration of assigned errors not founded upon trial court objections. We have examined the record in detail as to these matters, and find in them no basis for reversal..

THE JUDGMENT OF NOT GUILTY AS TO UNION WIRE ROPE CORPORATION IS AFFIRMED.

In force at the time of the accident, and for some months prior thereto, was a workmen's compensation insurance policy issued by American to Auchter. It included the following provision:

> The company and any rating authority having jurisdiction by law shall each be permitted to inspect the workplaces, machinery and equipment covered by this policy and to examine and audit the insured's books, vouchers, contracts, documents and records of any and every kind at any reasonable time during the policy period and any extension thereof and within three years after termination of this policy, as far as they relate to the premium bases or the subject matter of this insurance.

American also insured Auchter under a public liability policy which contained a similar clause. It should be noted that both policy provisions gave American the right to inspect Auchter's premises and equipment, but did not impose upon it any duty to do so.

---

* As to the first point, Union denies that there was a previous ruling applicable to the evidence in question, and argues that it should have been admitted. As to the closing argument, Union relies on Lindroth v. Walgreen Co., 338 Ill App 364, 383, 87 NE2d 307.

American had insured Auchter under comparable policies for many years, and had classified Auchter as one of its "special risks," designating an assured which would develop an annual premium in excess of $25,000. American customarily rendered safety engineering services to its "special risk" accounts, and used its engineering department as a talking point in the selling of policies. It also engaged in a program of national advertising, the principal theme of which was that years of close cooperation between contractors and American's safety engineers had resulted in the saving of lives, limbs and dollars.*

Before issuance of a particular policy, a survey and report by the engineering department would be considered by American's underwriting department in determining whether or not to accept the risk. After a policy was written, one of its engineers would make periodic inspections, and report his findings to both American and the assured. One of the functions of the engineering department was to help assureds reduce their accidents. Toward this end safety recommendations were made from time to time and they were ordinarily complied with. Sometimes the sales department considered it desirable to follow up on such recommendations, and noncompliance with an urgent recommendation would normally lead to cancellation of the policy.

American's district safety engineer for a district comprising the state of Florida was H. D. McClain, of Orlando, who had been inspecting construction projects for some fifteen years. His activities constituted essentially the only contact between American and Auchter, so far as this case is concerned. Since the theory of plaintiffs' case against American is based upon negligent performance of a gratuitous undertaking to perform safety engineering services, and, since

---

* One such advertisement mentioned that Auchter had insured with American for 20 years.

111

there was never a specific statement by American of the nature or scope of any such undertaking, either oral or written, the case against American must stand or fall upon proof of a course of conduct, through the evidence of what McClain did and did not do at the courthouse project.

He first came to Jacksonville while demolition operations were still going on, for the purpose of surveying and reporting conditions so that the underwriting department could submit the proper forms of insurance. He testified that after construction work commenced he visited the project seven times: on October 10, 1955; January 10, March 6, June 18, September 11, and October 25, 1956; and February 26, 1957; * that his visit to the site three weeks before the occurrence in question was, thus, the only inspection he made there during the period of almost five months preceding the accident.**

When McClain inspected the project he would walk over the entire area, including all floors and all parts of the site, but he testified that he never rode the hoist. He would observe conditions as he went along, not spending more than five or ten minutes in any one place. His average inspection trip took about four hours. During each visit he would see either Avent, Auchter's administrative engineer, or Hodge, the su-

---

* In his report covering the visit of January 10, 1956, McClain stated "bi-monthly service upon a regular basis has been scheduled to this job until completion."

** Thompson, a witness for plaintiffs, testified that he had been on the job 14 or 15 months as a sheet metal foreman and estimated that he had seen McClain 15 or 20 times. Carter, another sheet metal worker, testified, on behalf of plaintiffs, that he saw McClain at the site taking notes "approximately two or three times a week." Both Thompson and Carter also testified that they had once seen McClain ride on the hoist, but admitted that they had mentioned these matters for the first time in conversation with a lawyer in 1959.

112

perintendent, and he would discuss various matters with them. He found them very co-operative.

After each inspection McClain wrote letters to Auchter and made reports to American setting forth his findings. In these letters and reports McClain variously described his own work as: a continuing engineering service to Auchter in the control of accident probability; the making of recommendations for additional measures of hazard control; surveying Auchter's operations and job practices for loss control purposes; accident prevention work and assistance to Auchter in making the job safe; assistance in Auchter's safety activities and accident control at the job; the making of periodic surveys to inform Auchter of the overall aspect of controlling causes of accidents; and the criticizing of Auchter's job where conditions relative to the control of accident probability were not being maintained in accordance with the standards established by Auchter.

In three of McClain's seven reports he made "advisable" recommendations to Auchter respecting safety hazards he had noted. As an example, he wrote to Auchter, after his visit of January 10, 1956, that general housekeeping was not up to usual standards of Auchter jobs, and he specifically recommended as "advisable" that a pile of used 2x10 lumber be straightened and strips laid crosswise between ties to control the danger of its toppling over. He also advised the removal to storage or destruction of small pieces of wood with protruding nails to avoid the "nail puncture hazard presented to your employees and the employees of subcontractors."

Only one of the "advisable" recommendations referred to the hoist. It was included in McClain's letter and report following his visit to the site on June 18, 1956. At that time he suggested to Hodge that the hoist tower be grounded against lightning, and when he

113

returned on his next inspection trip he found that this had been done.

McClain's recommendations covered the general areas of housekeeping, physical safeguards, maintenance and hazard conditions. Aside from such matters as improperly piled lumber and protruding nails, they related specifically to the covering of access holes, the grounding of power cables, the clean-up of job litter, the lashing of ladders to prevent slipping, scaffolding maintenance, stairway conditions, trash clean-up, etc.

Hodge described McClain's visits as a check-up on Auchter's housekeeping, noting that among the chief hazards on a construction project were nail punctures, absence of appropriate guard rails, loose boards, and the like.

McClain's recommendations went to Avent who testified that such suggestions were complied with so long as they were reasonable; and that, so far as he knew, all of McClain's recommendations were carried out. George Auchter, president of the Auchter company, testified similarly that McClain made reasonable recommendations, and that he assumed they were complied with.

After McClain made recommendations, he did not check up to see if they were acted upon, and would, therefore, not know whether anything had been done until his next inspection visit some months later. He testified that he never gave any orders to Auchter's employees and had no control over them.

While making his inspections of the site, McClain, of course, saw the hoist. One portion of McClain's printed report forms was filled in by him as follows:

| No. of Elevators | Bldrs Type | Operated by Insured | Interest |
|---|---|---|---|
| 2 | hoists | yes | owners |

McClain held an elevator inspector's license from the city of Miami and he had made inspections of ele-

vators for American since 1942. In making elevator inspections he would take a close look at the sheaves and check the size of the grooves, using a gauge. The general condition of a cable would determine how far he would go in his inspection of an elevator cable, sometimes using a caliper, magnifying glass, hammer, etc., and sometimes removing grease from the cable at intervals to get a better look at it. He testified, however, that he did not make an "elevator inspection" of the hoist on this job because "We didn't classify it as an elevator. . . . It was a construction and materials hoist for raising and lowering materials up and down as the work progressed. . . . They are two different breeds of cat." *

* There can be no question but what the courthouse hoist was operated in violation of the Florida Elevator Law (Chapter 399, Florida Statutes) and the Jacksonville Elevator Ordinance (introduced into evidence by plaintiffs) if they were to be considered applicable. For example: the courthouse hoist did not have two hoisting cables; its sheaves were not 30 inches in diameter; it was not enclosed on the top and sides; it did not have a fire-resistant hoistway or fire-resistant doors.

It would appear, however, that the statute and ordinance excepted construction hoists from the application of their requirements, and thus furnished support for McClain in his conclusion that the hoist in question was not to be considered as an elevator.

In defining the term "elevator" the statute specifically states it "shall not include hand operated dumbwaiters, construction hoists, or other similar temporary lifting or lowering apparatus." (Section 399.01(2).)

The ordinance adopts by reference the "American Standard Safety Code for Elevators, Dumbwaiters and Escalators" and the "National Building Code" which, combined, comprise several hundred pages of rules and standards.

The Code for Elevators states that it "does not apply . . . to elevators used only for handling building materials and mechanics during the building construction."

The Building Code requires that "elevators" be "equipped for passenger service, in conformance with law or ordinance." It treats with "exterior hoists," however, as an altogether different item of equipment. As to the latter, it provides simply that

115

Hodge and McClain had a number of conversations in which the hoist was discussed. On one of these occasions McClain inquired as to whether the hoist was anchored against toppling over, and he then observed guy wires and bracing used for such purpose.

In one of his early conferences with Hodge, McClain was told that drop tests of the hoist had been made and that the safety devices had worked satisfactorily, stopping the bail and unloaded platform within 12 to 18 inches.

McClain made "visual observations" of the cable from the ground, but said that he never saw anything about it which gave him concern, so he did not inspect it closely for spurs.*

In talking to Hodge about the cable, McClain was advised that the cable was ¾ inch, with a breaking strength of 42,000 pounds, and, upon observation, the cable appeared to McClain to be what Hodge had said it was. Hodge and McClain estimated, on the basis of the loads to be carried, that the cable had a safety factor of 7 to 1 and was, therefore, considered satisfactory. McClain talked to Hodge about maintenance of the cable, and told him that regular inspection was important for safety, since an unlubricated cable has a tendency to break and wear as it passes over the sheaves.

"Temporary construction hoists on the exterior of buildings or structures shall be erected on sufficiently solid foundations to avoid injurious settlement or distortion."

The trial court ruled that both statute and ordinance were applicable to the hoist in question, and accordingly permitted them to be presented to the jury. American argues that this action by the court was highly prejudicial and constituted reversible error under the circumstances. Because of the conclusion we reach as to plaintiffs' case, considered in its entirety, we do not find it necessary to pass on this point.

* In describing the nature of his inspections, McClain also mentioned that he had never inspected the steam boiler.

No one had consulted McClain in regard to the purchase of the tower, the size of the sheaves, or its rigging. After the tower was erected, however, he was told by Hodge about the change in rigging from a one-part to a two-part line for the purpose of reducing speed. From his routine observation of the hoist in operation, McClain noticed that the rigging employed sheaves, but he did not know, nor was he told, that the sheave at the top of the bail was smaller than the others, and that it had not been furnished new with the tower by Archer. He also observed generally that the hoist was powered by an electric winch, that it had an operator, safety devices, twin towers, and two-to-one rigging. He stated that his interest in the hoist was as it related to the job as a whole, to whatever exposure there was on the job to injury or property damage.

McClain testified that he could not say whether the alignment of the guide rails on the tower would or would not prevent the safety devices from operating; that he sighted up them just as a matter of observation; that he watched the cage go up and down and saw it operating smoothly.

As previously mentioned, on one of McClain's inspection visits he advised grounding the tower against lightning, and this recommendation was complied with. During another of his visits he also inspected the brake drum to see that there was no oil on the drum that might cause the brakes to slip.

When the hoist was first put into operation, McClain asked a definite question of Hodge as to whether anybody would be permitted to ride on the hoist, and received a definite answer in the negative. He was never advised to the contrary. He testified that he himself never rode the hoist and that the only time he ever saw a man on the hoist was on one occasion when he saw an Auchter employee inspecting the

117

cable. McClain further testified that, if he had known that men were riding the hoist, he would have recommended against it.*

As to his last visit to the site on February 12, 1957, McClain testified that he made his "usual visual observation of the tower"; that he saw the lift platforms going up and down and they seemed to be going reasonably smoothly; that he didn't notice anything out of order, nothing that gave him any particular concern.

Auchter had its own safety program. Its president testified that it did not employ a safety engineer, but its safety program consisted of day-to-day caution and awareness, safety advice by superintendents to subordinates, and periodic visits by others, etc.; that safety was the responsibility of each project foreman and superintendent; and that, since problems of safety on a construction job change from time to time, they did not rely on intermittent inspections by an outside agency. He considered that Hodge, the superintendent of the courthouse project, was in charge of the safety program on that job.

Glass, a graduate civil engineer and vice president of Auchter, testified, on behalf of plaintiffs, that one man from the general office, Avent, was assigned to visit the job every day, and that supervision of safety matters was part of his duties; that chief reliance in safety matters was, however, placed upon Hodge, the superintendent, because he was on the job at all times; that from time to time, meetings of superintendents were held at which safety was one of the topics of dis-

---

* The evidence of McClain and others as to the dates of his visits to the project indicates that he was at the job only three or four times after the men had commenced riding on the hoist. Several witnesses for plaintiffs said that they had seen McClain on the premises on days when the hoist was in operation with men riding it.

118

cussion; and that on the day of the accident he himself had discussed some safety problems with Hodge.

Glass further testified that Auchter had a good insurance rate, computed on its accident experience; that he would say that American had contributed to that safety record, but that "we ourselves attempted to be safety conscious" to keep down costs. He also said that he would expect McClain to report to Auchter if he found an unsafe condition.*

Avent, called as a witness on behalf of plaintiffs, testified that he was a graduate of Massachusetts Institute of Technology in civil engineering and was the project manager of the courthouse job; that Hodge had detailed one employee to make regular inspections of the hoist; that such regular inspections were made; that he, Avent, depended upon those inspections to determine the safety of the hoist; and that he himself made no inspections of the hoist.

Hodge also testified, on behalf of plaintiffs, that every foreman was instructed to look out for hazards on the job at all times and to report them to him; that he himself checked various phases of the job in regard to safety almost constantly. He said that it was his job to maintain vigilance in that connection and that he and his men did so.

Hodge further testified that Auchter did not rely on any outsider to make safety inspections, but that if anyone did make a recommendation and it was feasible, he corrected the matter. Particularly as to McClain, Hodge stated that McClain came around about every two or three months, but that "We didn't rely on anybody to take care of those things. We looked after them ourselves." In answer to direct questions as to whether or not he relied upon McClain or his inspections, Hodge replied, "No, sir."

---

* It is not claimed by plaintiffs that McClain failed to report any condition which he found to be unsafe.

119

Glass also testified that Auchter did not place any reliance upon McClain's visits for purposes of safety on the project because he wasn't there often enough to carry into effect any program he might initiate; that McClain made safety suggestions on a periodic basis, but that the Auchter company carried on its own safety program on a day-to-day basis.

McClain himself testified that he never worked as an inspector for Auchter, and that he never undertook any duties whatever for Auchter. He said that Auchter had maintained a safety program for a long time prior to his visiting their projects starting in 1954; that their own mechanics carried on the company's inspection program and that Forbes, the maintenance supervisor (the man who had been in charge of rigging the tower) was in charge of all mechanical inspection. McClain stated in one of his reports: "The safety program is one of direct supervision here and is consistent with the program discussed upon other jobs of this assured. It is held satisfactory due to management policy and the use of competent supervision and management upon the job."

■ We regret having written at such length in reciting the facts on which both parties rely, but consider it necessary, in fairness to plaintiffs, because of the conclusion we reach based on those facts. We also believe that the statement of facts demonstrates the dilemma which plaintiffs faced in being required: (1) to prove, by evidence of a course of conduct on the part of McClain in making inspections of the hoist, an undertaking to make the kind and number of inspections which, if performed negligently, would result in liability, as alleged; and (2) to prove such negligence by showing that McClain did not make such inspections. We believe it to be clear that plaintiffs' proof showed that McClain did not make such inspec-

tions, but we believe it to be equally clear that their proof of McClain's course of conduct failed to establish the necessary undertaking. And we reach this conclusion upon consideration of the evidence under the rules applicable to the directing of a verdict for defendant, and to the consideration of a motion for judgment notwithstanding the verdict. (Moss v. Wagner, 36 Ill App2d 86, 87, 183 NE2d 528; Loveless v. Warner, 37 Ill App2d 204, 206, 185 NE2d 392; Pennington v. McLean, 16 Ill2d 577, 582, 158 NE2d 624; Seeds v. Chicago Transit Authority, 409 Ill 566, 570–571, 101 NE2d 84.)

██ ██ An undertaking is, of course, essential to liability, because there can be no actionable negligence in the absence of a duty which has been violated. (American Box & Lumber Co. v. Chandler, 102 Fla 907, 138 So 29; Raphael v. Koretzky, 102 So2d 746, 747 (Fla App, 1958).) The question of whether or not a duty was properly performed is a question of fact, but whether, under the facts, the law raises a duty is a question of law. (Joy v. Chicago, B. & Q. R. Co., 263 Ill 465, 470, 105 NE 330; Masters v. Central Illinois Elec. & Gas Co., 7 Ill App2d 348, 368, 129 NE2d 586.)

██ There can be no doubt that the law has for many years recognized the principle that liability can arise from negligent performance of a voluntary undertaking. (Coggs v. Bernard, 2 Lord Raymond 909; 86 CJ2d 927; 38 Am Jur 659; 5 HLR 222.) As stated by Justice Cardozo in Glanzer v. Shepard, 233 NY 236, 135 NE 275:

> It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.

Thus, for example, a landlord who is under no obligation to repair the premises, but who nevertheless

121

makes repairs, and does so negligently, is liable to his tenant and others on the premises in the tenant's right, for injuries caused by such negligence. (Roesler v. Liberty Nat. Bank of Chicago, 2 Ill App2d 54, 118 NE2d 621; Kimmons v. Crawford, 92 Fla 652, 109 So 585.) Other cases cited to this point by plaintiffs are: Triolo v. Frisella, 3 Ill App2d 200, 121 NE2d 49 (a neighbor voluntarily assisting in the felling of a tree, negligently killed a child); and Banfield v. Addington, 104 Fla 661, 140 So 893 (plaintiff was burned by negligent operation of a hair-waving device); and in United States v. Lawter, 219 F2d 559, applying Florida law, it was held that liability resulted when a coastguard helicopter, in attempting rescue of the crew from a swamped skiff, negligently dropped one of the persons into the sea.

▉ American does not dispute the principle of these cases, but does contest its application to the case at bar. With this position we agree, because there is no claim here that any negligence by American caused the hoist to fall. This line of authorities involves active negligence, or misfeasance, on the part of the volunteer, and constitutes the only type of case which is appropriate to plaintiffs' statement of the sole proposition on which they rely for common law liability, namely: that the liability of a volunteer who fails to use due care "extends to all who may be said to come within the orbit of risk *created by the actor's negligence.*" The defendants in the cases just cited could well be said to have created or brought into existence a risk, or danger, by their own misfeasance, but the complaint against American cannot be made to fit any such classification. American is charged only with nonfeasance, or failure to detect and report a risk, or dangerous condition, already existing.

As to nonfeasance, we must first consider the scope and character of the undertaking in order to deter-

mine whether the nonfeasance alleged constituted a breach of duty. We find, as we have seen, that a landlord may become liable for negligently making voluntary repairs, but, by undertaking to repair one part of the premises, he cannot be charged with the duty to repair other parts. (Home Owners' Loan Corporation v. Huffman, 124 F2d 684; Huffman v. Home Owners' Loan Corporation, 150 F2d 162; Sawyer v. Atherley, 312 Mass 596, 45 NE2d 844; Coradi v. Sterling Oil Co., 378 Pa 68, 105 A2d 98; Grugan v. Shore Hotels, 126 NJL 257, 18 A2d 29; Bauer v. 141–149 Cedar Lane Holding Co., 24 NJ 139, 130 A2d 833.)

Also pertinent as to scope of undertaking, are those cases holding that a person assuming the owner's duty to maintain an elevator is not liable to third parties for injuries resulting from operation or anything other than negligent maintenance. (Wolfmeyer v. Otis Elevator Co., 262 SW2d 18 (Mo, 1953); Otis Elevator Co. v. Embert, 198 Md 585, 84 A2d 876; Blackhawk Hotels Co. v. Bonfoey, 227 F2d 232.)

In Zamecki v. Hartford Accident & Indemnity Co., 202 Md 54, it was held that an insurance company which had issued a public liability policy covering a grandstand, and had, pursuant to a right reserved in the policy, inspected and approved the construction of the stand, was, nevertheless, not considered as having undertaken responsibility for its maintenance and, consequently, was not liable to a third person injured in the collapse of the stand.

We shall not extend this opinion with an analysis of the facts recited above, to indicate the limitations in scope of McClain's undertaking. The facts themselves, we believe, make those limitations abundantly clear. We shall only conclude, based on the facts relied on by plaintiffs, and on the law as we understand it, that McClain's (and, therefore, American's) course of conduct did not evidence a voluntary undertaking

to make any more thorough or more frequent inspections of the hoist than those which were actually performed; that a duty (and breach of duty) of the nature and extent which would be necessary to sustain plaintiffs' verdict was far beyond the scope of American's voluntary undertaking to furnish limited safety engineering services, and finds no support in the record.

One of the charges in the complaint against American was that it failed to detect and warn Auchter and plaintiffs that the hoist was being used by personnel, when use for that purpose was unsafe and in violation of the Jacksonville elevator ordinance. There can be no question but that Auchter and plaintiffs knew that men were riding the hoist. Since McClain denied that he knew it and testified that if he had known it he would have recommended against it, there is at the very least some doubt that he knew of the practice. Assuming that he did know of it, however, we fail to see how from that fact the law could raise a duty on his part to warn Auchter and plaintiffs against violations of law or obvious dangers.

If there were a violation of the ordinance (as contended by plaintiffs), Auchter and plaintiffs were, equally with American, chargeable with knowledge of the law. And certainly the danger to men riding an open-platform construction hoist is as apparent to them as to anyone else. Furthermore, Hodge's own testimony indicated that he knew the practice was dangerous because he originally forbade it, and was later warned against it by a representative of the Florida Industrial Commission.

██ These circumstances serve to point up the applicability of the Florida rule of law which holds that "there is no duty to warn one of visible and obvious hazards." (Bashaw v. Dyke, 122 So2d 507, 510 (Fla App, 1960); German-American Lumber Co. v.

Hannah, 60 Fla 70, 53 So 516; Wauchula Mfg. & Timber Co. v. Jackson, 70 Fla 596, 70 So 599.)

■■■ Neither Auchter nor plaintiffs relied upon McClain to inspect the hoist or its cable. The only evidence on this subject is the testimony of the Auchter officials. Glass, Avent and Hodge, offered as witnesses on behalf of plaintiffs, all testified that Auchter relied upon its own safety program, and placed no reliance upon McClain. Under both Florida and Illinois law, plaintiffs are bound by the testimony of such witnesses, standing, as it does, uncontradicted and unrebutted. (Duncan v. Growers Equipment Co., 146 Fla 516, 1 So 458; Kapraun v. Kapraun, 12 Ill2d 348, 355, 146 NE2d 7.)

■■■ We come, therefore, to the question as to whether nonfeasance in connection with a gratuitous undertaking can give rise to liability, unless it be shown that the intended beneficiaries of the undertaking had relied upon its performance. We believe it cannot, because under those circumstances reliance lies at the very heart of the cause of action.

The element of reliance as a basic and necessary prerequisite to liability in such a case is recognized throughout the Restatements of the American Law Institute. Since there is no Florida decision determinative of the point under consideration, we shall quote rather extensively from the Restatements, as they appear to be highly regarded by the Florida Supreme Court under such circumstances. (Propper v. Kesner, 104 So2d 1 (Fla, 1958); Rawls v. Ziegler, 107 So2d 601 (Fla, 1958); Matthews v. Lawnlite Co., 88 So2d 299 (Fla, 1956); Tampa Drug Co. v. Wait, 103 So2d 603 (Fla, 1958).)

Section 325 of the Restatement of Torts states:

> One who gratuitously undertakes with another to do an act or to render services which he should recognize as necessary to the other's bodily safety

and thereby *leads the other in reasonable reliance upon the performance of such undertaking*

(a) to refrain from himself taking the necessary steps to secure his safety or from securing the then available protective action by third persons, or

(b) to enter upon a course of conduct which is dangerous unless the undertaking is carried out,

is subject to liability to the other for bodily harm resulting from the actor's failure to exercise reasonable care to carry out his undertaking.

To similar effect is Section 90 of the Restatement of Contracts:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

 We realize, of course, that plaintiffs' claims do not sound in contract, but the analogy bears interestingly upon our situation. Also analogous are the principles set forth in the Restatement of Agency (Second), for surely American as a volunteer could owe no greater duty to Auchter than it would if it had been Auchter's expressly designated agent in charge of safety.

Section 354 states:

An agent who, by promise or otherwise, undertakes to act for his principal under such circumstances that some action is necessary for the protection of the person or tangible things of another, is subject to liability to the other for phys-

ical harm to him or to his things *caused by the reliance of the principal or of the other upon his undertaking* and his subsequent unexcused failure to act, if such failure creates an unreasonable risk of harm to him and the agent should so realize.

Comment a (in part):

*Reliance Upon Agent's Undertaking.* An agent who, having undertaken a duty to his principal to act, fails to act is not liable to a person harmed by such failure merely because of a failure to perform this duty. . . . In the usual case, by undertaking a job a person prevents others from undertaking it, *since the principal relies upon him to perform it.* It is only where there has been *reliance either by the principal or by the third person upon proper performance* by the agent that the agent can be liable under the rule stated in this section. . . .

Section 378 states:

One who, by a gratuitous promise or other conduct which he should realize *will cause another reasonably to rely upon the performance of definite acts* of service by him as the other's agent, causes the other to refrain from having such acts done by other available means is subject to a duty to use care to perform such service or, while other means are available, to give notice that he will not perform.

Comment b (in part):

Unless there is consideration for the undertaking, the duty to perform is created only where performance is necessary in order to protect the other from the harm to his interests which otherwise would *result from his reliance upon the performance.* . . .

(Emphasis supplied in the above quotations.)

127

Professor Warren A. Seavey, of Harvard, Reporter for the Restatement, in the Appendix to Restatement of Agency (Second), discusses the above sections from Torts, Contracts and Agency and concludes at page 592:

> In these three sections from the three Restatements, *the element of reliance is obviously the basis of liability.* The section for the Restatement of Torts (Second) has not been written, but it is believed that it will agree in principle with the ideas expressed in this note. (Emphasis supplied.)

In an article entitled, "Reliance Upon Gratuitous Promises or Other Conduct," in 64 Harvard Law Review 913 (1951), Professor Seavey surveys the cases on nonperformance by a volunteer, and at page 928 sets forth this rule:

> Where a person represents by word or act that he has done or will do something upon the performance of which he should realize that *others will rely,* he is liable for expectable harm caused by *the reliance of others* and his failure of performance, if his representation was negligently or intentionally false, or if without excuse he fails to perform. (Emphasis supplied.)

Plaintiffs cite Section 323 of the Restatement of Torts and the cases of Triolo v. Frisella, 3 Ill App2d 200, 121 NE2d 49; United States v. Lawter, 219 F2d 559; and Banfield v. Addington, 104 Fla 661, 140 So 893 (among others) as indicating that reliance is not necessary. That section reads, in part:

> (1) One who gratuitously renders services to another, otherwise than by taking charge of him when helpless, is subject to liability for bodily harm caused to the other by his failure, while so

128

doing, to exercise with reasonable care such competence and skill as he possesses or leads the other reasonably to believe that he possesses.

We consider this rule, and these cases (which we have commented upon earlier in this opinion), as being properly applicable only in situations involving active negligence, or misfeasance.

Plaintiffs also rely on Section 357 of the Restatement of Torts, and on the Florida cases of Propper v. Kesner, 104 So2d 1, and Wiley v. Dow, 107 So2d 166, all of which pertain to breach of a covenant to repair, and are, therefore, not pertinent.

There is a group of authorities in which landlords were held liable to tenants who had been led to believe that gratuitous repairs to the premises had effectively been accomplished when, in fact, they had not. The element of reliance is clearly present in these cases, expressly or implicitly, even though there may also have been misfeasance on the part of the landlord (incomplete or ineffective attempted repair). (Roesler v. Liberty Nat. Bank of Chicago, 2 Ill App2d 54, 118 NE2d 621; Smith v. Kravitz, 173 Pa Super 11, 93 A2d 889; Marks v. Nambil Realty Co., 245 NY 256, 157 NE 129.)

In another group of cases it was held that there could be no recovery against landlords who had made negligent, gratuitous repairs, because of plaintiffs' failure to show reliance upon the undertakings. (Hill v. Day, 108 Me 467, 81 A 581; Kuchynski v. Ukryn, 89 NH 400, 200 A 416; Rhoades v. Seidel, 139 Mich 608, 102 NW 1025.) To the same effect is Kirshenbaum v. General Outdoor Advertising Co., 258 NY 489, 180 NE 245, 247, which involved attempted repairs of a leaking roof. In that case the court put the question as being "whether or not we have a case of *misrepresentation by conduct and reliance thereupon,*" and, after discussing the facts, concluded: "There was

129

therefore nothing in the conduct of the defendant which gave assurance to the plaintiff that further leakage would not occur, and *no reliance* was placed upon any such assurance by the plaintiff. (Emphasis supplied.)

Plaintiffs count heavily on the decision in Hartford Steam Boiler Inspection & Ins. Co. v. Pabst Brewing Co., 201 Fed 617 (CCA 7), but this, too, was a case in which the element of reliance by plaintiff was extremely important. An insured sued its insurer in tort alleging, among other things, that defendant had voluntarily undertaken to inspect plaintiff's boiler; that plaintiff was not knowledgeable in that field and relied on defendant's representations; that defendant made periodic inspections and reports, and plaintiff relied wholly thereon. In posing the question to be answered by its decision, the court said at page 628:

> The law casts upon the owner of the boilers when in use, as instrumentalities of danger, the duty to inspect and care for their safety, for protection of the public; and, of course, the owner may delegate the inspection and care to competent employes or other agency (or both) remaining answerable for their negligent performance. As foundation for the present charge of liability, however, it is contended that *the duty of inspection was assumed by the Insurance Company*, as an undertaking outside the insurance contract and its purposes, *to relieve the Brewing Company of performance thereof, and all inspections were so made and relied upon* for safety in use of the boiler up to the time of the explosion. Thus the question arises: Can liability be so predicated, at the side of the insurance contract, and without other consideration, for alleged negligent inspection? (Emphasis supplied.)

After reciting the undisputed facts in the case, the court then answered its question as follows (page 629):

> We are of opinion that these facts of continuous conduct on the part of the Insurance Company in reference to the inspections and their purpose— *if relied upon by the Brewing Company and so understood by the Insurance Company, as alleged* —are of probative force to show both the undertaking of duty and relation of the parties upon which the action for negligence in performance thereof may be predicated. (Emphasis supplied.)

A somewhat different principle distinguishes the case at bar from Van Winkle v. American Steam Boiler Insurance Co., 52 NJL 240. That case arose on the pleadings, in a suit brought by an insured's injured neighbor against the insurer on a gratuitous undertaking to the insured outside the policy. The insurance company on a specific reservation of rights undertook to inspect the insured paper company's boiler periodically and furnish certificates indicating the maximum pressure at which it could safely be operated. Inspections were made and certificates were issued to the insured, but when it used the boiler in conformity with defendant's certification the boiler burst. The court said at page 474:

> It does not appear to be doubtful, from the statements in the declaration, that it was an essential part of the duty of the paper company, in the safe and skillful management of this boiler, to have it examined and tested, from time to time, by a person of requisite knowledge. It was this necessary function that the defendant entered upon the execution of. . . . What this defendant did was this: It co-operated with the owner of this

131

> dangerous instrument in its management, in a particular indispensable to its safe use, and it thereby in that degree *constituted itself the agent or the substitute of such owner.*

Van Winkle appears to contain the element of reliance, certainly, but it also presents a situation in which the insurance company had taken over from its insured all, or part, of the latter's maintenance obligation in regard to a dangerous instrument. American, obviously, made no such undertaking in the instant case. (Other cases containing expressions similar to Van Winkle on the point of assuming another's obligations are Zamecki v. Hartford Accident & Indemnity Co., 202 Md 54, 95 A2d 302 and Sheridan v. Aetna Casualty & Surety Co., 3 Wash2d 423, 100 P2d 1024.)

Plaintiffs rely substantially upon Smith v. American Employers' Insurance Co., 102 NH 530, a suit by an injured employee against his employer's compensation insurance carrier for negligent performance of a gratuitous undertaking to inspect a compressor and air tank. The tank had exploded, injuring plaintiff.

This case, also, was decided on the pleadings. The principal question determined by the court, in a 3–2 decision, was that the defendant, while the insurer of plaintiff's employer, could nevertheless be considered as a third party tort feasor and was not immune from common law liability under the New Hampshire Compensation Act.* The complaint was thus held to be good, as against a motion to dismiss, and the case was returned for trial of the "tort action."

---

* At the very next session of the legislature after the filing of the Smith opinion, an amendatory bill was enacted nullifying the effect of the decision so far as it related to the Compensation Act, and making it clear that a compensation carrier was immune from common law liability. It would appear from this history that the court's interpretation of the statute had been contrary to the legislative intent.

We know very little about the facts in the Smith case, as the opinion gives no more of them than are outlined above. The record in that case discloses, however, that the complaint alleged, basically, that the defendant had *"entered into an agreement"* to inspect the compressor and tank with regard to their safety, to warn "of any defects or dangers involved in the design, maintenance, and/or operation" thereof, and to instruct and supervise the insured's employees in their maintenance and operation.

Whether these allegations do, as a matter of law, set forth an action in tort would seem to be doubtful in view of Buskey v. New England Tel. & Tel. Co., 91 NH 522, 23 A2d 367, Barrett v. New England Tel. & Tel. Co., 80 NH 354, 117 A 264, and Pittsfield Cottonwear Mfg. Co. v. Pittsfield Shoe Co., 71 NH 522, 532, 53 A 807, which hold that an action in tort form will not lie if the foundation for it is, in substance, a breach of the defendant's contract with a third person.

In any event, the Smith opinion furnishes nothing of value to either plaintiffs or defendant in the case at bar affecting our determination of the factual questions relating to the scope of defendant's undertaking and reliance thereon by others.

■■ ■■ As to the common law tort liability asserted against American, we, therefore, conclude: (1) the type of thoroughgoing and continuous inspection of the hoist and its cable which was the responsibility of Auchter, and the careful execution of which might have prevented this tragic occurrence, was not within the scope of the safety engineering services gratuitously undertaken by American, but (2) if it were to be considered within the scope of such undertaking, then, since neither Auchter nor plaintiffs placed any reliance upon American to perform such services, liability cannot be imposed for their nonperformance.

■■ ■■ In addition to the basic contention that there was no common law action proved against it, American advances two arguments relating to the Florida Workmen's Compensation Act (Chapter 440, Florida Statutes).

The first of these propositions is that American is not a "third party tort-feasor" within the meaning of the Florida Act, and, therefore, not subject to suit, since that act clothes both an employer and an employer's compensation insurer with immunity from common law actions for injuries sustained by employees in the course of employment.

This question is not precisely answered by the Florida statute, and appears not to have been passed upon by the Florida courts. It has, therefore, been treated in the briefs by elaborate analysis of the entire framework of the Florida statute and by citation of numerous cases from other jurisdictions.* These decisions necessarily involve other statutes, differing in some respects from the Florida act, and thus require extensive study to determine the existence of possible parallels.

The second proposition based on the Florida Compensation Act is this: If American were to be considered as having obligated itself to Auchter to perform a constant and thorough safety inspection service,** then American would have become a subcontractor of Auchter, and would, in consequence, have become entitled, under the act, to a subcontractor's immunity from common law suits by employees of the general contractor and its other subcontractors on the courthouse project.

---

* See, for example, the case of Smith v. American Employers' Insurance Co., 102 NH 530, upon which we have commented earlier in this opinion.

** An assumption which is, of course, contrary to American's basic theory of defense.

134

We shall not enlarge this opinion further to discuss the arguments and decisions advanced in support of, and in opposition to, these two points, except to indicate that we accept the validity of both propositions.

American has also submitted a lengthy briefing of its alternative position (if the judgments against it were not to be reversed) to the effect that certain trial errors should entitle it to a new trial on the issue of liability alone. In view of our decision, these matters will not be considered.

THE JUDGMENTS AGAINST AMERICAN MUTUAL LIABILITY INSURANCE COMPANY ARE REVERSED.

This conclusion as to American necessarily disposes of plaintiffs' cross-appeal.

Affirmed in part.

Reversed in part.

MURPHY, J., concurs.

BURMAN, P. J., took no part in the decision of this case.

SUPPLEMENTAL OPINION

PER CURIAM:

■■■ Plaintiffs have filed a "Motion for reargument and reconsideration of this cause before a three-judge court." They argue that, since three judges of this court participated in consideration of the case, but only two participated in its decision, plaintiffs did not receive the review to which they were entitled by law.

While the motion makes reference to the constitution, there is no constitutional issue present. Chapter 37, § 31 of the Illinois Revised Statutes (enacted in

1877), relating to Appellate Courts, provides that two judges shall constitute a quorum and that the concurrence of two shall be necessary to every decision. On the authority of this statute, two-judge Appellate Court decisions have been made and reported throughout the years, commencing with Volume 1 of the Appellate Court reports, and their validity has been upheld by the Supreme Court in Kinne v. Duncan, 383 Ill 110, 48 NE2d 375 and People ex rel. Byrnes v. Stanard, 9 Ill2d 372, 137 NE2d 829.

 We feel constrained to note that counsel's suggestions in support of both Motion and Petition contain much that is irrelevant and highly improper, including intemperate and disrespectful attacks on the court. We consider the inclusion of these matters to be unprofessional and inexcusable.

The Motion for Reargument and Reconsideration is without merit and is denied.

 The Petition for Rehearing (which is ruled on by Justices English and Murphy), is also without merit, having presented nothing which the court considers "to have been overlooked or misapprehended," and it is, therefore, denied. (Rule 14, Uniform Illinois Appellate Court Rules.)